

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-7-2007

# Wishkin v. Postmaster General

Precedential or Non-Precedential: Precedential

Docket No. 05-4743

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Wishkin v. Postmaster General" (2007). *2007 Decisions.* Paper 1549.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1549

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4743

———


RICHARD M. WISHKIN
                              Appellant
                    v.

JOHN E. POTTER, POSTMASTER GENERAL


———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 03-cv-04475)
District Judge:  Honorable Eduardo C. Robreno

———

Argued November 9, 2006

Before: SLOVITER, CHAGARES, and GREENBERG,
Circuit Judges

(Filed: February 7, 2007)
_____

Joyce Ullman   (Argued)
Philadelphia, PA 19107

    Attorney for Appellant

Richard M. Bernstein   (Argued)
Office of United States Attorney
Philadelphia, PA 19106

    Attorney for Appellee

SLOVITER, Circuit Judge

The issue before us is whether the District Court properly applied the McDonnell Douglas paradigm in granting summary judgment for the defendant/appellee United States Postal Service ("USPS") in the claim brought by plaintiff/appellant Richard Wishkin ("Wishkin") under the Rehabilitation Act of 1973.

**I.**

Wishkin is a fifty-eight year old mentally disabled man who was hired by the USPS in 1969 under a federal program aimed at employing adults with disabilities. After a three-year trial period, Wishkin became a permanent employee as a mail handler. The only incident on Wishkin's otherwise clean record was a suspension in 1991 for absenteeism, but when it was determined that his absenteeism was caused by a work-related hernia injury that occurred in 1983, he was reinstated with back pay. As a result of that injury, Wishkin is limited to pushing, pulling, or lifting no more than 20 pounds.

In 1998, there was talk in the Post Office that the "bag room," the unit in which Wishkin was employed, might close. Wishkin was concerned that he would then face unemployment. To protect himself from this possibility, on March 3, 1998, Wishkin requested his urologist, Dr. Harvey Yorker, to write a letter recommending that he be considered for permanent disability, ostensibly because of his health problems and limitations. It is undisputed that Dr. Yorker wrote the letter reluctantly, and both Joseph A. Madison, Wishkin's disability counselor, and Dr. Yorker tried to convince Wishkin to wait to deliver the letter to his supervisor until he received official confirmation that the bag room was closing. Despite their warnings, Wishkin delivered the letter to his supervisor, Mary Green, soon after he received it.

On April 22, 1998, Green scheduled a "fitness for duty" examination at the medical office of the Post Office for Wishkin. She also scheduled such an examination for several other employees who worked in the bag room and were similarly disabled. On the fitness for duty examination request form, Green cited Wiskhin's "constant and reoccurring kidney problems, knee problems, chronic pulmonary disease, very slow movements, easy fatigue, and frequent absences," as reasons for the examination. App. at 104a. There is no independent support on the record that these symptoms had intensified during Wishkin's tenure. Dr. Evangelista, the USPS's physician, examined Wishkin as requested from approximately 8:50 A.M. until 11:20 A.M. and then released him to work with documentation that he was "fit for duty" with the same physical restrictions necessitated by Wishkin's past injury. Wishkin then submitted his fitness for duty form to Green.

Wishkin alleges that upon receiving the fitness for duty documentation, Green became angry, telephoned the medical unit, and ordered Wishkin to return to the medical unit for another fitness for duty examination that afternoon. Wishkin arrived at the medical office at 1:10 P.M. and, without seeing a physician, left at 1:15 P.M. with a form declaring him "not fit for duty." App. at 203. The USPS asserts that Dr. Evangelista was unaware of Dr. Yorker's letter when he determined Wishkin to be "fit," and that with new knowledge of the letter and therefore new knowledge of Wishkin's ailments, Dr. Evangelista changed Wishkin's status from "fit" to "unfit," with a recommendation for permanent disability retirement. App. at 119a.

At approximately 3:00 P.M. that afternoon, Green accompanied Wishkin to the Labor Relations office to begin paperwork for disability retirement. Wishkin refused to fill out the papers and stated that he did not wish to retire. Green then instructed Wishkin not to return to work and told him that he was "off the clock."

The Labor Relations representative summoned Wishkin's Union Chief Shop Steward, Gerald Redd. Redd assured Wishkin that under the collective bargaining agreement he could

3

not be forced to sign retirement papers against his will. According to Wishkin, Green then scheduled an appointment for Wishkin to see Kim Shockley, a human resources representative, so that Shockley would inform him what his disability retirement benefits projection might be. On April 29, 1998, Wishkin and Madison, his disability counselor, met with Shockley who presented him with paperwork necessary to file for permanent disability. Wishkin again refused to sign any paperwork related to disability retirement.

After Dr. Evangelista had declared Wishkin unfit for duty, Wishkin was not permitted to return to work at the Post Office. He did not receive disability retirement benefits because he refused to file the necessary paperwork. On May 5, 1998, at Wishkin's behest, Dr. Yorker submitted another letter to USPS regarding Wishkin's condition, but it was limited in its scope and it failed to address all of his medical conditions or his ability to work at the Post Office. After USPS Human Resources Manager Harvey White received the second letter from Dr. Yorker and phone calls from Madison on Wishkin's behalf, White wrote to Wishkin advising that before he could return for duty his physicians must address all of his medical conditions and his status regarding each. On July 27, 1998, Dr. Stanley Essl, Wishkin's family physician, submitted a letter to USPS on Wishkin's behalf, stating that Wishkin is currently "able to return to the same light duty work he has done for many years in the past." App. at 141a.

On March 9, 1999, Wishkin received notification that the health benefits he had been receiving from USPS since he stopped working were to be terminated effective May 7, 1999. On April 13, 1999, Dr. Essl submitted another letter to USPS stating, in more detail than in his previous letter, that Wishkin is able to return to work, with the same physical limitations that were previously required.

Wishkin reported back to work on April 14, 1999 and resumed his responsibilities as a mail handler, working in the bag room until it closed in late 2000. He was then transferred to another department sorting magazines and bulk mail. A cardiac

4

condition forced Wishkin to retire in 2003.

Wishkin filed suit against John E. Potter, Postmaster General of the United States, on August 1, 2003 under Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq., and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., alleging that he was the victim of disability discrimination. Wishkin seeks monetary relief, including back pay, costs, restoration of pension benefits, compensatory and punitive damages, and attorney's fees.

At the close of discovery, USPS moved for summary judgment, which the District Court granted. Wishkin has filed a timely appeal to this court, limited to the allegation of disability discrimination under the Rehabilitation Act.

**II.**

In granting summary judgment to the defendant, the District Court held that there was insufficient evidence to create a genuine issue of material fact as to whether USPS intentionally discriminated against Wishkin. Under the relevant federal rule, a court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor. Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). Issues such as intent and credibility are rarely suitable for summary judgment. As the Supreme Court noted in Pullman-Standard v. Swint, 456 U.S. 273, 290 (1982), even before Title VII plaintiffs were entitled to a jury determination, discriminatory intent means actual motive, and is a finding of fact to be determined by the factfinder.

5

A decision on summary judgment requires analysis of both the applicable law and the facts placed on record. The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., applicable to federal employers and to employers receiving federal funding. See 29 U.S.C. § 791(g). As we stated in Shiring v. Runyon, 90 F.3d 827, 830-31 (3d Cir. 1996), the Rehabilitation Act "forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement." To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must initially show, "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." Id. at 831. The existence of a prima facie case of employment discrimination is a question of law that must be decided by the court but the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied. Sarullo v. United States Postal Serv., 352 F.3d 789, 797-98 (3d Cir. 2003) (per curiam).

We have stated that "the ADA, ADEA and Title VII all serve the same purpose - to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well." Newman v. GHS Osetopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995). Accordingly, the familiar framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793-94 (1973), for Title VII cases is equally applicable to discrimination claims under the Rehabilitation Act.

Under the McDonnell Douglas burden shifting paradigm, plaintiff has the initial burden to make a prima facie showing of discrimination, but if s/he does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action. Id. at 802. If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted. Tex. Dep't. of Cmty. Affairs v.

6

Burdine, 450 U.S. 248, 254-55 (1981). However, the plaintiff must then be afforded an opportunity to show that the employer's stated reason for the employment action, such as plaintiff's rejection or separation, was pretextual. McDonnell Douglas, 411 U.S. at 804. In order to prove the employer's explanation is pretextual, the plaintiff must "cast[ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication . . . or . . . allow[ ] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994). A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either "(i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Id. at 764.

Applied to this case, Wishkin must prove that he has a "disability" in order to meet the requirements of the first element of the prima facie case. The statute defines an "individual with a disability" as an individual who has (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. 29 U.S.C. § 705(20)(B). The USPS does not dispute that Wishkin satisfies the first element of his prima facie case. He is mentally retarded and gained employment at USPS in 1969 through a federal program aimed at providing adults with mental disabilities the opportunity to work.

In contrast, the USPS disputes whether Wishkin has satisfied the second and third elements of a prima facie case. The District Court found that because Wishkin himself represented that he was eligible for permanent disability by procuring a letter from his doctor to that effect, he is not qualified to perform the essential functions of the job and did not satisfy the prima facie elements for a Rehabilitation Act claim.

7

The District Court stated:

> In this case, plaintiff himself represented that he
> was eligible for permanent disability and procured
> a letter from his doctor to that effect. Based upon
> the plaintiff's doctor's letter, plaintiff was declared
> "unfit for duty" by the USPS. If plaintiff is unfit
> for duty, ergo he is not qualified to perform the
> essential functions of the job at issue. While
> plaintiff claims that he obtained the letter from his
> doctor under "duress," he has not presented
> evidence that the content of the letter is not
> accurate or correct, or that the doctor who wrote
> the letter agrees that plaintiff is now fit for duty or
> not entitled to consideration for permanent
> disability. Therefore, plaintiff has not satisfied the
> prima facie elements for a Rehabilitation Act claim
> under the McDonnell Douglas paradigm.

App. at 6a. We believe the District Court erred in concluding
that the analysis should end there.

Our review of the record discloses that Wishkin has put
forth evidence that throws into question the District Court's
conclusion that Wishkin did not meet the qualification
requirement. Madison, who had accompanied Wishkin to Dr.
Yorker's office testified that Wishkin told Dr. Yorker that
Green, his USPS supervisor, continually placed pressure on him
to procure a letter from his physician regarding his eligibility for
permanent disability. Green told Wishkin that the bag room, the
department in which Wishkin worked, would soon be eliminated
and that Wishkin's job would be mechanized. Madison
recounted that Wishkin

> said he needed a note from the doctor that would
> describe his problems that he could use to get
> Disability Retirement, and Dr. Yorker, said I'm not
> going to write that, Richard. He said, I need it,
> Mrs. Green is after me. I'm not going to write that
> Richard, you're too young. And I'm there. I said

8

> Richard, what's this for?  We are over here to see your doctor about kidney stones and now you are talking about this.  And he said, Mrs. Green says they are closing down the Bag Room and I'm not going to have a job.  I'm going to be out on the street and I'm too young to apply for pension, and this is the only way I can save myself.
>
> And Dr. Yorker did not want to write it, but based on that and his insistence, he agreed to write it.

App. at 86a-87a.

Madison also testified there is evidence to suggest that a number of similarly situated disabled employees were being convinced to leave their positions at USPS and take permanent disability because they were being told their jobs were to be eliminated in the near future.  Although the District Court's one paragraph disposition suggests that Wishkin wanted to retire or take permanent disability, Wishkin produced evidence to the contrary.  It is undisputed that he refused to sign the paperwork necessary for permanent disability and he insisted that he wished to continue working.  Therefore, although Wishkin had, in fact, procured a letter from his physician attesting to his inability to continue working (which the District Court deemed dispositive), the circumstances surrounding the procurement of the letter required the District Court to treat Wishkin's qualification as disputed.

The District Court pretermitted the McDonnell Douglas analysis before reaching the third step - at which the employee must be permitted to show that the employer's facially neutral reason for the employment action was pretextual.  Wishkin made an adequate showing to satisfy that requirement.  The USPS's physician, Dr. Evangelista, deemed him "fit" for duty after a lengthy evaluation.  Although that determination was changed to "unfit" later that day, the circumstances leading to that quick about face warranted further inquiry, as there was a suggestion that Green's phone call may have been responsible.  The testimony of Redd, the Union Steward, also suggests a

9

discriminatory purpose on the part of the USPS. He testified that "they had declared [Wishkin] fit for duty in the morning and three hours later they declared him unfit for duty." App. at 303a. He concluded that the conduct of the USPS in this case presented "one of the most unusual situations [he] had seen take place" and that he "had never seen that happen before or since." App. at 303a.

Furthermore, Wishkin had been performing the essential functions of the job for nearly twenty years, and there was no evidence of recent changes to his health status or ability to work that might have precipitated Wishkin's request for a physician's letter, other than Wishkin's stated reason that he felt pressure to protect himself from unemployment. For summary judgment purposes, the District Court should not have accepted the USPS's characterization of Wishkin as not qualified based solely on the letter that he procured from a physician reluctant to grant it. A trier of fact could accept Wishkin's evidence supporting his contention that USPS's efforts to force him to take permanent disability were motivated by discrimination against its disabled employees. Wishkin contends that his supervisor continually targeted disabled employees working in the bag room by conducting "circle meetings," involving only disabled employees, during which they were often told that the bag room would be closing, that their jobs would no longer be needed, that they were unable to be trained for a different position, and that it would be best if they took permanent disability. App. at 266a. Many disabled employees did in fact leave USPS as a result. App. at 310a-312a. Moreover, many of the disabled employees were scheduled for fitness for duty examinations on the same day, which, according to Union Chief Shop Steward Gerry Redd, was unheard of. Typically, employees are only given fitness for duty examinations if there is a specific instance of questionable behavior; they are not considered a routine procedure. Id. The unusual circumstances surrounding the fitness for duty examinations of all the disabled employees and the consistent and routine warnings given to the disabled employees regarding their job status could support Wishkin's contention that the adverse employment action in question was motivated by discrimination. For purposes of summary judgment, he has

10

presented a genuine issue of material fact.

Despite the fact that Wishkin procured Dr. Yorker's letter, which was the basis for the District Court's grant of summary judgment, there is substantial evidence, particularly when the evidence is viewed in the light most favorable to Wishkin, the non-moving party, to support his argument that the letter was only procured under duress and as a result of a calculated attempt to force similarly situated disabled employees to take permanent disability retirement.

## III.

For the reasons set forth, we will reverse the order granting summary judgment as to the Rehabilitation Act claim (Count I) and remand for further proceedings consistent with this opinion.