**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1159
_____

MT. HOLLY GARDENS CITIZENS IN ACTION, INC., a
New Jersey non-profit corporation; PEDRO AROCHO;
REYNALDO AROCHO; ANA AROCHO; CHRISTINE
BARNES; BERNICE CAGLE; LEON CALHOUN;
GEORGE CHAMBERS; DOROTHY CHAMBERS;
SANTOS CRUZ; ELIDA ECHEVARIA; NORMAN
HARRIS; MATTIE HOWELL; NANCY LOPEZ; VINCENT
MUNOZ; ELMIRA NIXON; LEONARDO PAGAN;
ROSEMARY ROBERTS; WILLIAM ROBERTS; EFRAIM
ROMERO; HENRY SIMONS; JOYCE STARLING;
TAISHA TIRADO; VIVIAN BROOKS; ANGELO NIEVES;
DOLORES NIXON; ROBERT TIGAR; JAMES POTTER;
RADAMES TORRES-BURGOS; LILLIAN TORRES-
MORENO; DAGMAR VICENTE; CHARLIE MAE
WILSON; LEONA WRIGHT; MARIA AROCHO;
PHYLLIS SINGLETON; FLAVIO TOBAR; MARLENE
TOBAR; SHEILA WARTHEN; ALADIA WARTHEN,
Appellants,

v.

TOWNSHIP OF MOUNT HOLLY, a municipal corporation
of the State of New Jersey; TOWNSHIP COUNCIL OF
TOWNSHIP OF MOUNT HOLLY, as governing body of the

Township of Mount Holly; KATHLEEN HOFFMAN, as Township Manager of the Township of Mount Holly; KEATING URBAN PARTNERS L.L.C., a company doing business in New Jersey; TRIAD ASSOCIATES, INC., a corporation doing business in New Jersey; JULES K. THIESSEN, as Mayor of the Township of Mount Holly.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1:08-02584)
District Judge: The Honorable Noel L. Hillman

_____

Argued July 14, 2011

_____

Before: SLOVITER, FUENTES, and FISHER, *Circuit Judges*

(Opinion Filed: September 13, 2011)

Olga D. Pomar, Esq. (Argued)
South Jersey Legal Services, Inc.
745 Market Street
Camden, NJ 08102

Susan Ann Silverstein, Esq.
AARP Foundation Litigation
601 E Street, NW
Washington, DC 20049

William R. Potter, Esq.

Potter & Dickson
194 Nassau Street
Princeton, NJ 08542

*Counsel for Appellants*

M. James Maley, Jr., Esq.  (Argued)
Emily K. Givens, Esq.
Erin E. Simone, Esq.
M. Michael Maley, Esq.
Maley & Associates, P.C.
931 Haddon Avenue
Collingswood, NJ, 08108

*Counsel for Appellees, Township of Mount Holly, Township
Counsel of Mount Holly, Kathleen Hoffman, and Jules
Thiessen*

Gaetano Mercogliano, Esq.
Neal A. Thakkar, Esq.
Sweeney & Sheehan, P.C.
216 Haddon Avenue, Suite 500
Westmont, NJ 08108

*Counsel for Appellee, Triad Associates, Inc.*

William J. DeSantis, Esq.
Ballard Spahr
210 Lake Drive East
Cherry Hill, NJ  08002

*Counsel for Appellee, Keating Urban Partners, L.L.C.*

Thomas E. Perez, Esq.
Dennis J. Dimsey, Esq.
April J. Anderson, Esq.
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, DC 20044-4403

*Counsel for Amicus Curiae United States of America*

——————————

OPINION OF THE COURT
——————————

FUENTES, *Circuit Judge*.

Mount Holly Township (the "Township") has proposed a redevelopment plan that would eliminate the existing homes in its Gardens neighborhood, occupied predominantly by low-income residents, and replace them with significantly more expensive housing units. Appellants, an association of Gardens residents organized under the name Mt. Holly Gardens Citizens in Action, and 23 current and former residents of the neighborhood (collectively the "Residents") filed suit against the Township alleging violations of various anti-discrimination laws.

Before the Township filed an Answer or discovery on these allegations had taken place, the District Court granted summary judgment to the Township. Because the District

4

Court misapplied the standard for deciding whether the Residents could establish a *prima facie* case under Title VIII and because it did not draw all reasonable inferences in the Residents' favor, we will reverse.

## I.[1]

The homes in this dispute are located in a 30-acre neighborhood called the Gardens in the Township of Mount Holly in Burlington County, New Jersey. The Gardens is the only neighborhood in the Township comprised predominantly of African-American and Hispanic residents. It is poor— almost all of its residents earn less than 80% of the area's median income; with most earning much less.

The 329[2] homes in the Gardens are predominantly two-story buildings made out of solid brick. Built in the 1950s, the homes are attached in rows of 8 to 10 and are set back from the curving streets to allow for front and back yards, with alleys running behind each housing block. Two major commercial districts abut opposite sides of the neighborhood, which is only a mile away from the major

---

[1] Because this is an appeal from a motion granting summary judgment, we examine the record evidence in the light most favorable to the non-moving parties, here the Residents, while resolving all reasonable inferences in their favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

[2] The record inconsistently describes the number of homes as 327 or 329. (JA 61, 776, 1114).

downtown business district. Until 2004, the neighborhood was also home to a playground and a community center.

The 2000 census provides a snapshot of the neighborhood.[3] According to that data, the Gardens neighborhood was split evenly between rental properties (with a median rental price of $705 per month) and homeowners (the median cost of homeownership was $969 per month). Eighty-one percent of the homeowners had lived in their homes for at least 9 years; 72% of renters had lived there for at least five years. Of the 1,031[4] residents living in the neighborhood, 203, or 19.7%, were non-Hispanic Whites; 475, or 46.1% were African-Americans; and 297, or 28.8% were Hispanic, the highest concentration of minority residents within Mt. Holly. Almost all of these residents were classified as "low income"; indeed, most were classified as having "very low" or "extremely low" incomes.

---

[3] The parties dispute the utility of data from the 2000 census. However, none of the parties has briefed or even asked the question of *when* precisely the violations at issue in this case began. This issue is important because the redevelopment process began in 2002 and, as a result, the demographics of the township have changed. Disputes over which census numbers to use thus create a moving target; however, the 2000 census data appears to provide the most accurate demographic data at the inception of the redevelopment process.

[4] This is an approximate number provided by the Residents' expert. Elsewhere in the record, the neighborhood is described as home to 1,605 people. (JA 1114).

The neighborhood was not perfect. For one, it was crowded. This created a parking shortage, which led residents to pave their backyards for use as driveways, which, in turn, led to drainage problems. In addition, the fact that the homes were owned in fee simple meant there was no one with a vested interest in maintaining common spaces, such as the alleys. Some of the owners were nothing more than absentee landlords, renting to individuals with little interest in maintaining the properties. Over the years, many of the properties fell into disrepair. Vacant properties were boarded up, some yards filled with rubbish, and parts of the area became blighted. Because the houses were connected to one another, the dilapidation of one house could and sometimes did lead to the decay of the adjoining houses. Finally, the dense population, narrow streets, and vacant properties facilitated crime. In 1999, 28% of crimes in the Township occurred in the Gardens, even though that neighborhood covers only 1.5% of the Township's land area.

These many problems were not ignored. Local community activists and business leaders worked to revitalize the Gardens through a private initiative that eventually came to be known as "Mt. Holly 2000." This community endeavor sought to reverse the neighborhood's decline by rehabilitating properties and increasing social services. Despite sporadic achievements—ten homes were renovated and a community policing center was established—the neighborhood's problems continued.

In the year 2000, the Township commissioned a study to determine whether the Gardens should be designated as an "area in need of redevelopment" under New Jersey's redevelopment laws. The resulting report, issued on

7

November 8, 2000 concluded that the area offered a "significant opportunity for redevelopment" because of blight, excess land coverage, poor land use, and excess crime. (JA 699). That same year, the Township began to acquire properties in the Gardens. Those properties were left vacant.

A series of redevelopment plans followed. In 2003, the Township issued the Gardens Area Redevelopment Plan ("GARP"). This plan called for the demolition of all of the homes in the neighborhood and the permanent or temporary relocation of all of its residents. In their place, the plan provided for the construction of 180 new market-rate housing units, thirty of which would be available only to senior citizens. The plan was changed in 2005 to include a parcel of land immediately north of the Gardens. This plan, the West Rancocas Redevelopment Plan, also called for the destruction of most of the original Gardens homes, to be replaced with 228 new residential units composed of two-family dwellings and townhouses. Unlike the GARP, the West Rancocas plan provided for the optional rehabilitation of some of the original Gardens homes and allowed for the residents of those rehabilitated units to be temporarily relocated in phases so that they could remain in the neighborhood. The West Rancocas plan also contemplated that 10% of the 228 units would be designated as affordable housing. Finally, in 2008, the plan was changed again. This time, the Revised West Rancocas Redevelopment Plan called for construction of up to 520 houses, 75% of which could be townhouses and 50% of which could be apartments. The revised plan called for only 56 deed-restricted affordable housing units, 11 of which would be offered on a priority basis to existing Gardens residents. This revised plan did not include any rehabilitation of existing units.

At each stage of the process, many Gardens residents objected to the redevelopment, complaining about the destruction of their neighborhood and expressing fear that they would not be able to afford to live anywhere else in the Township. One resident complained that the house next to hers was torn down and that a bulldozer had hit her home, tearing the wall, cracking the ceiling, and shifting her roof. (JA 577-78, 1001). Another resident, a 70-year-old disabled homeowner, told the Township's Planning Board that, were he displaced, he would be unable to work and unable to afford a new home. (JA 1002). At one meeting in 2005, a planning expert testified that the West Rancocas plan was deficient because it only allowed rehabilitation as an option, without requiring or even encouraging it. He also said that 90% of the Gardens' existing residents would not be able to afford the newly-constructed homes and complained that the plan did not provide an estimate of affordable housing in the existing market for displaced residents. (JA 990, 1117).

Despite these complaints, work on the development continued. In February 2006 Keating Urban Partners, LLC, was chosen as the plan developer. Keating, in turn, hired Triad to develop a relocation plan. That plan, the Workable Relocation Assistance Plan ("WRAP"), was submitted to the New Jersey Department of Community Affairs on September 28, 2006 and provided that all residents living in the Gardens on August 1, 2006 would receive relocation assistance. Qualified homeowners would receive $15,000 and a $20,000 no-interest loan to assist in the purchase of a replacement home. The Township offered to buy homes for between

$32,000 and $49,000.[5] The estimated cost of a new home in the development was between $200,000 and $275,000, well outside the range of affordability for a significant portion of the African-American and Hispanic residents of the Township.

Renters were authorized to receive up to $7,500 of relocation assistance, but were not eligible for relocation funds to return to the Gardens. In any case, the vast majority of those renters would be unable to afford the proposed market-rate rent of $1,230 per month. Eventually, the Township paid to relocate 62 families, 42 of which moved outside of Mt. Holly Township. Renters who moved often had to pay more in rent at their new homes.

Although the redevelopment plan called for building in phases, the Township began to acquire and demolish all of the homes in the Gardens, thereby displacing many residents and creating conditions that encouraged the remaining residents to leave. By August 2008, 75 homes had been destroyed and 148 homes had been acquired and left vacant. Later that fall, the Township demolished 60 more homes. And, in the summer of 2009, 50 more homes were knocked down. Residents living amongst the destruction were forced to cope with noise, vibration, dust, and debris. Worse, the interconnected nature of the houses triggered a cascading array of problems. Uninsulated interior walls were exposed to the outside and covered with unsightly stucco or tar. But these coatings did not extend below grade, allowing moisture to seep into subterranean crawl spaces, creating an

---

[5] One home sold for $64,000 and another sold for $81,000.

environment for mold problems. Above, the demolitions opened the roofs of adjoining homes. Those openings were patched with plywood, which was insufficient to stop water leaks. Around the neighborhood, homes bore the scars of demolition: hanging wires and telephone boxes, ragged brick corners, open masonry joints, rough surfaces, irregular plywood patches, and damaged porches, floors and railings. Destruction of the sidewalks outside demolished homes further contributed to the disarray by making it difficult to navigate through the neighborhood. By June 2011, only 70 homes remained under private ownership and the Township was in the process of demolishing 52 properties that it had acquired. These conditions discouraged any attempt at rehabilitating the neighborhood and encouraged existing residents to sell their homes for less than they otherwise might have been worth.

In October 2003, Citizens in Action filed a suit in state court alleging violations of New Jersey's redevelopment laws and procedures, and various anti-discrimination laws. Ultimately, the New Jersey Superior Court dismissed some counts and granted summary judgment to the Township on the others, concluding that there was no violation of New Jersey law, that the area was blighted, and that the anti-discrimination claims were not ripe because the plan had not yet been implemented. The Appellate Division affirmed, and the New Jersey Supreme Court denied a petition for certiorari.

The Residents filed suit in the District Court on May 27, 2008, raising the anti-discrimination claims that had not been ripe in their state suit. The federal complaint alleged, among other things, violations of the Fair Housing Act (the

11

"FHA"), Title VIII of the Civil Rights Act of 1968; the Civil Rights Act of 1866, as codified at 42 U.S.C. § 1982[6]; and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[7]   The Residents asked for declaratory and injunctive relief to stop the redevelopment plan, as well as damages or compensation that would allow Gardens residents to obtain housing in the Township.   The Residents' motion for a preliminary injunction was denied. After they filed an Amended Complaint, the Township, along with the other named defendants, filed motions to dismiss. The District Court converted these into motions for summary judgment and, after allowing the parties time to brief the motions, granted summary judgment to the Township defendants.   The District Court ruled that there was no *prima facie* case of discrimination under the FHA and that, even if there was, the Residents had not shown how an alternative course of action would have had a lesser impact.

The Residents filed a timely appeal and we granted the Residents' motion to stay redevelopment pending this appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II.

---

[6] 42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

[7] Section 1 of the Fourteenth Amendment provides in pertinent part that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

We exercise plenary review over a District Court's ruling on summary judgment. *See Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 635 F.3d 87, 92 (3d Cir. 2011). "Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010)).

The FHA makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). A dwelling can be made otherwise unavailable by, among other things, action that limits the availability of affordable housing. *See, e.g.*, *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 928-29, 938-39 (2d Cir. 1988); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1059, 1062-64 (4th Cir. 1982); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 130 (3d Cir. 1977). The FHA can be violated by either intentional discrimination or if a practice has a disparate impact on a protected class. *Cmty. Serv., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005).

Disparate impact claims, which do not require proof of discriminatory intent, *see Rizzo*, 564 F.2d at 147-48, permit federal law to reach "[c]onduct that has the necessary and foreseeable consequence of perpetuating segregation[, which] can be as deleterious as purposefully discriminatory conduct in frustrating the national commitment to replace the ghettos by truly integrated and balanced living patterns." *Metro.*

13

*Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1289-90 (7th Cir. 1977). In order to determine whether action of this sort was "because of race" we look to see if it had a "racially discriminatory effect," i.e., whether it disproportionately burdened a particular racial group so as to cause a disparate impact. *Rizzo*, 564 F.2d at 146-48; *see also Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of Twp. of South Plains,* 284 F.3d 442, 466-67 (3d Cir. 2002) (featuring claims of a disparate impact on handicapped persons in violation of 42 U.S.C. § 3604(f)). This is called a *prima facie* case of discrimination. *Rizzo,* 564 F.2d at 148 & n.31. If such a case is established, then we look to see whether the defendant has a legitimate, non-discriminatory reason for its actions. *Id.* at 148. If it does, the defendant must then also establish that "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Id.* at 149. Finally, if the defendant makes this showing, the burden once again shifts to those challenging the action, who must demonstrate that there is a less discriminatory way to advance the defendant's legitimate interest. *Id.* at 149 n.37.

## A.

When viewed in the light most favorable to the Residents, the evidence submitted by the Residents was sufficient to establish a *prima facie* case. "[N]o single test controls in measuring disparate impact," but the Residents must offer proof of disproportionate impact, measured in a plausible way. *Hallmark Developers, Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006). Typically, "a disparate impact is demonstrated by statistics," *id.* at 1286, and a *prima facie* case may be established where "gross statistical

14

disparities can be shown." *Hazleton Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977). According to the data in the 2000 census conducted before the redevelopment plan began, 22.54% of African-American households and 32.31% of Hispanic households in Mount Holly will be affected by the demolition of the Gardens. The same is true for only 2.73% of White households. In short, the Residents' statistical expert has calculated that African-Americans would be 8 times more likely to be affected by the project than Whites, and Hispanics would be 11 times more likely to be affected. Furthermore, the 2000 data showed that only 21% of African-American and Hispanic households in Burlington County would be able to afford new market-rate housing in the Gardens, compared to 79% of White households.

The District Court's first error was in rejecting the Residents' statistical submissions, which should have been taken in the light most favorable to them at this stage in the proceedings. These statistics, like those presented in *Rizzo* and other prominent housing discrimination cases, show a disparate impact. In *Rizzo*, the plaintiffs presented evidence that, of the 14,000-15,000 people on a waiting list for public housing, 85% were black and 95% were of a minority background. 564 F.2d at 142. Under these circumstances, we concluded that the cancellation of a public housing project had a "racially disproportionate effect, adverse to Blacks and other minorities in Philadelphia." *Id.* Similarly, the plaintiffs in the Second Circuit case of *Huntington Branch* used statistics showing that while only 7% of the residents in a town required subsidized affordable housing, 24% of that town's Black residents required such housing, which meant that Black residents were three times more likely to be affected by a shortage of affordable housing. 844 F.2d at

15

929. And in *Keith v. Volpe*, the Ninth Circuit concluded that the FHA was violated where a blocked housing project had twice the adverse impact on minorities. 858 F.2d 467, 484 (9th Cir. 1988). The disparate impact here, while not as extreme as the impact in *Rizzo*, is similar to or greater than the disparate impact found sufficient to establish a *prima facie* case elsewhere. Under these circumstances, the District Court erred in granting summary judgment to the Township.

Further, the District Court's challenge to these statistics in a footnote did not make the appropriate inferences. (JA 15-16 n.9). Instead, the District Court challenged the statistical analysis underlying the 21% figure of Burlington County minority residents who could afford units the redeveloped Gardens as both too broad, because it took account of the entire population of Burlington County, and too narrow because it failed to consider minorities *outside* the county who might move in.

In addition, the District Court said the 21% figure did not take into account the fact that 56 of the units in the Revised West Rancocas Plan would be designated as affordable housing. But the District Court's analysis failed to take into account the Residents' evidence that these units, although labeled "affordable," would be out of reach for almost all of the Gardens residents.

The District Court also said that the statistics failed to take into account non-minority purchasers who might rent to minorities. But, unless those purchasers offered below-market rents, this would not affect the inference that the project had a disproportionate effect on Blacks and Hispanics who would be unable to afford market-rate units.

16

As to the District Court's concern that the statistics did not take into account minorities who might move elsewhere in Mount Holly, the Residents' expert opined that affordable housing in the Township was scarce, and that most Gardens residents would not be able to afford market-rate units elsewhere in the Township.

Lastly, the District Court erred when it rejected a reasonable inference in favor of the Residents by looking at the *absolute* number of African-American and Hispanic households in Burlington County that could afford homes. Instead, the District Court should have looked to see whether the African-American and Hispanic residents were *disproportionately* affected by the redevelopment plan. *See Huntington*, 844 F.2d at 938 ("By relying on absolute numbers rather than on proportional statistics, the district court significantly underestimated the disproportionate impact of the Town's policy."); *Hallmark Developers*, 466 F.3d at 1286 ("[I]t may be inappropriate to rely on absolute numbers rather than on proportional statistics.") (quoting *Huntington*, 844 F.3d at 928.).[8]

There is another problem. The District Court's most troubling error is its conflation of the concept of disparate treatment with disparate impact. The District Court essentially agreed with the Township that because 100% of minorities in the Gardens will be treated the same as 100% of non-minorities in the Gardens, the Residents failed to prove

---

[8] The Department of Justice filed an *amicus curiae* brief agreeing that the District Court erred in its disparate impact *prima facie* case analysis.

there is a greater adverse impact on minorities.  This was in error.  We need not simply ask whether the White residents at the Gardens are *treated* the same as the minority residents at the Gardens.  The logic behind the FHA is more perceptive than that.  It looks beyond such specious concepts of equality to determine whether a person is being deprived of his lawful rights because of his race.  Rather, a disparate impact inquiry requires us to ask whether minorities are disproportionately *affected* by the redevelopment plan.  Thus the Residents can establish a *prima facie* case of disparate impact by showing that minorities are disproportionately burdened by the redevelopment plan or that the redevelopment plan "[falls] more harshly" on minorities.  *Doe v. City of Butler*, 892 F.2d 315, 323 (3d Cir. 1989).

The Township asserts that a disparate impact approach would result in the unintended consequence of halting the redevelopment of minority neighborhoods and that it is foreclosed by the Supreme Court's decision in *City of Memphis v. Greene*, which states that

> [b]ecause urban neighborhoods are so frequently characterized by a common ethnic or racial heritage, a regulation's adverse impact on a particular neighborhood will often have a disparate effect on an identifiable ethnic or racial group.  To regard an inevitable consequence of that kind as a form of stigma so severe as to violate the Thirteenth Amendment would trivialize the great purpose of that charter of freedom.

451 U.S. 100, 128 (1981).

18

There are three problems with the Township's position. First, *City of Memphis* was concerned with the standard for establishing a violation of the Thirteenth Amendment's ban on the "badges and incidents of slavery in the United States." *Id.* at 125-26. Whatever that standard might be—a question left open by the Supreme Court's ruling in that case, *see id.* at 130 (White, J., concurring)—*City of Memphis* did not consider the FHA. All of the courts of appeals that have considered the matter, including this one, have concluded that plaintiffs can show the FHA has been violated through policies that have a disparate impact on a minority group. *See Greater New Orleans Fair Housing Action Center v. HUD*, 639 F.3d 1078, 1085 (D.C. Cir. 2011) (acknowledging the majority view but declining to take a position on the matters); *Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); *Mountain Side Mobile Estates P'ship v. HUD,* 56 F.3d 1243, 1250-51 (10th Cir. 1995); *Jackson v. Okaloosa County,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 269 n.20 (1st Cir. 1993); *Keith,* 858 F.2d at 482-84; *United States v. Starrett City Assocs.*, 840 F.2d 1096, 1100 (2d Cir. 1988); *Arthur v. City of Toledo,* 782 F.2d 565, 574-75 (6th Cir. 1986); *Smith*, 682 F.2d at 1065; *United States v. Mitchell*, 580 F.2d 789, 791-92 (5th Cir. 1978); *Rizzo,* 564 F.2d at 147-48; *Metro. Hous. Dev. Corp.*, 558 F.2d at 1290; *United States v. City of Black Jack*, 508 F.2d 1179, 1184 (8th Cir. 1974).

Second, the Township's approach urges us to conclude that the FHA is violated only when a policy treats each individual minority resident differently from each individual White resident. Under our precedent, a plaintiff may

establish a *prima facie* case of discrimination by demonstrating that the policy disproportionately affects or impacts one *group* more than another—facially disparate treatment need not be shown. For instance, in *Rizzo*, the waiting list for public housing comprised 85% African-Americans and 95% minorities, meaning that 5% were White. 564 F.2d at 142. The White residents on the list were treated the same as the minority residents on the list—each was hurt by Philadelphia's decision to block a public housing project—but we nevertheless found a violation of the FHA because cancelling the project had a "racially disproportionate effect" on African-Americans. *Id.* at 149 ("Nor can there be any doubt that the impact of the governmental defendants' termination of the project was felt primarily by blacks, who make up a substantial *proportion* of those who would be eligible to reside there.") (emphasis added).

The Township may be correct that a disparate impact analysis will often allow plaintiffs to make out a *prima facie* case when a segregated neighborhood is redeveloped in circumstances where there is a shortage of alternative affordable housing. But this is a feature of the FHA's programming, not a bug. The FHA is a broadly remedial statute designed to prevent and remedy invidious discrimination on the basis of race, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982), that facilitates its anti-discrimination agenda by encouraging a searching inquiry into the motives behind a contested policy to ensure that it is not improper. *See* Christine Jolls, *Antidiscrimination and Accommodation*, 115 Harv. L. Rev. 642, 652 (2001) (remarking that a "leading gloss" on the Supreme Court's decision in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), is that "disparate impact functions as a means of smoking out

20

subtle or underlying forms of intentional discrimination on the basis of group membership."). We need not be concerned that this approach is too expansive because the establishment of a *prima facie* case, by itself, is not enough to establish liability under the FHA. It simply results in a more searching inquiry into the defendant's motivations—precisely the sort of inquiry required to ensure that the government does not deprive people of housing "because of race."

Finally, the Township seems to argue that its redevelopment plan does not violate Title VIII unless the statistics show that it increases segregation in the Township. (Twp. Br. at 18.). Showing that a policy has a segregative effect is one way to establish a violation of Title VIII, but it is not the only way. *See Huntington Branch*, 844 F.2d at 937 (observing that a policy often discriminates in one of two ways: having a disparate impact or perpetuating segregation). The Township is free to argue that its plan is less discriminatory than all of the available alternatives because it does the best job of integrating the neighborhood. However, those arguments are properly considered in the context of the last steps of the Title VIII analysis, not as a requirement of the *prima facie* case.

In reality, the District Court's decision was based on a valid and practical concern, which appears to drive its reasoning throughout the opinion. It feared that finding a disparate impact here would render the Township powerless to rehabilitate its blighted neighborhoods. This underlying rationale distorts the focus and analysis of disparate impact cases under the FHA. In disparate impact cases, "[e]ffect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful

21

scheme." *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1977). Once the Residents established a *prima facie* case of disparate impact, the District Court's inquiry must continue to determine whether a person is being deprived of his lawful rights because of his race. It must ask whether that Township's legitimate objectives could have been achieved in a less discriminatory way.

**B.**

Once the plaintiffs establish a *prima facie* case, the defendants must offer a legitimate reason for their actions. In this case, everyone agrees that alleviating blight is a legitimate interest. The core of the dispute between the parties is over the next step of the FHA's burden-shifting analysis: whether the defendants have shown that there is no less discriminatory alternative. *Rizzo*, 564 F.2d at 149. Only when the defendants make this showing does the burden shift back to the plaintiffs—where it ultimately remains—to provide evidence of such an alternative. *Id.* at 149 n.37. The test for whether there is no alternative is "similar to the test of whether the defendant has demonstrated that the requested accommodation is 'unreasonable' for the purposes of rebutting a claim under § 3604(f)(3)(B)." *Lapid-Laurel*, 284 F.3d at 468. Section 2604(f)(3)(B) of the FHA requires that reasonable housing accommodations be made for individuals with disabilities. In other words, the defendant must show that the alternatives impose an undue hardship under the circumstances of this specific case. *See US Airways v. Barnett*, 535 U.S. 391, 401-02 (2002) (discussing the term "unreasonable accommodation" under the Americans with Disabilities Act).

The District Court characterized the Residents' proposed alternative as follows:

> [E]ffectively, plaintiffs are seeking to remain living in the blighted and unsafe conditions until they are awarded money damages for their claims and sufficient compensation to secure housing in the local housing market. Although couched at times like an effort to have the development go up around them, like a highway built around a protected tree, or to have their units rehabilitated, this makes little if no practical sense after years of litigation, approved redevelopment plans, and the expenditure of significant public resources. At this late stage, the only real practical remedy is for plaintiffs to receive the fair value for their home as well as proper and non-discriminatory relocation procedures and benefits . . . . The relief they are seeking is inconsistent with proving the fourth element of their FHA claim-namely, that an alternative course of action to eminent domain and relocation is viable.

(JA 17 n.12) (ellipsis in original).

The Residents' evidence is susceptible to more favorable inferences. The Residents are not asking for permission to continue to live in "blighted and unsafe" conditions. Instead, they argue that there is a feasible plan that meets the Township's goals and entails more substantial rehabilitation. Taking the evidence in the light most favorable to the Residents, one could credit the report of the

23

Residents' planning expert, which stated that the "blighted and unsafe" conditions could be remedied in a far less heavy-handed manner that would not entail the wholesale destruction and rebuilding of the neighborhood.

The Residents' expert pointed out that, although the Revised West Rancocas Plan called for development in stages, the Township began the development by aggressively acquiring houses, which it left vacant and then destroyed. He opined that a more gradual redevelopment plan would have allowed existing residents to move elsewhere in the neighborhood during one part of the redevelopment, and then move back once the redevelopment was completed. The Residents' expert further noted that the Township had not performed a comparative cost analysis showing that total demolition, relocation, and new construction was less feasible than an alternative focused on rehabilitation. Indeed, the expert went on to propose an alternative redevelopment plan that would rely on the targeted acquisition and rehabilitation of some of the existing Gardens homes, the combination of some houses to make larger homes, an initiative to make the houses more attractive through the use of landscaping and added amenities such as decks and porches, and selective demolition and new construction, including the construction of more affordable units. The Residents' expert also provided examples of previous alternatives—including one developed as early as 1989—to show that the complete demolition of the neighborhood was not the only possible solution to blight in the Gardens.[9] Finally, he provided a non-exhaustive list of

---

[9] The 1989 plan was not provided as *the* alternative but only to show that less discriminatory alternatives had been considered in the past and could serve as the basis for an

24

state and federal funding programs that would support such a redevelopment plan and observed that the Township had failed to make an active effort to locate a developer with experience in neighborhood rehabilitation.

The Township provided the contrasting statements of its Township manager, who argued that a rehabilitation program was not economically feasible. In support, she cited the fact that one alternative, the Mt. Holly 2000 program, demonstrated that rehabilitation of each unit would be extremely costly. She also challenged the availability of sources of funding for a rehabilitation. Lastly, she emphasized the many problems that led the Township to declare the Gardens an area in need of redevelopment and asserted the belief of the Township Council and its planning board that demolition and replacement is the most effective and efficient approach to solving the neighborhood's problems.

These contrasting statements, as well as the parties' continued arguments on appeal as to the cost and feasibility of an alternative relying on rehabilitation, create genuine issues of material fact that require further investigation. Once the record on alternatives has been more fully developed, the District Court may entertain renewed motions for summary judgment, taking into account the Township's initial burden of showing that there are no less discriminatory alternatives, as well as the standard advanced in *Lapid-Laurel* for

---

updated approach that would lessen the redevelopment's impact on minority residents of the Township.

ultimately determining whether an alternative is unreasonable.[10]

## III.

The Residents are also seeking to recover under the theory that the Township intentionally discriminated against its minority residents when it adopted the redevelopment plan. The District Court saw no evidence of intentional discrimination and granted the Township's motion for summary judgment. After carefully considering the matter, we discern no error in the District Court's decision and will thus affirm that ruling.

## IV.

The Township has broad discretion to implement the policies it believes will improve its residents' quality of life. But that discretion is bounded by laws like the FHA and by the Constitution, which prevent policies that discriminate on the basis of race. For this reason, "the federal courts must

---

[10] Triad asserts that the portion of the District Court's order relating to its involvement should be affirmed because the Residents, on appeal, have waived their claims against it. We disagree. In their brief, the Residents argue that the redevelopers, which include Triad, provided inadequate relocation assistance, allowed residents to be improperly pressured to leave, and that the redevelopment plan essentially pushes minority residents out of Mount Holly. For all of the reasons stated in this opinion, these are genuine issues of material fact that must be resolved through further discovery on remand.

stand prepared to provide 'such remedies as are necessary to make effective the congressional purpose.'" *Rizzo*, 564 F.2d at 149 (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). A more developed factual record will assist the District Court in crafting appropriate remedies, if necessary. For all of the foregoing reasons, the District Court's order granting summary judgment is vacated and the case is remanded for further proceedings.