Filed 6/15/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>CITY OF LOS ANGELES et al.,<br><br>     Defendants and Respondents;<br><br>CH PALLADIUM, LLC et al.,<br><br>     Real Parties in Interest and Respondents. | B303308<br><br>Los Angeles County<br>Super. Ct. No.<br>19STCP03387 |

APPEAL from a judgment of dismissal of the Superior Court of Los Angeles County, Robert S. Draper, Judge. Affirmed.

AIDS Healthcare Foundation, Thomas A. Myers, Arti L. Bhimani, Liza M. Brereton; Strumwasser & Woocher and Beverly Grossman Palmer for Plaintiff and Appellant.

Office of the Los Angeles City Attorney, Michael N. Feuer, Terry Kaufmann-Macias, John W. Fox, Jennifer Tobkin, Kathryn Phelan, Kabir Chopra, Craig Takenaka, Mei-Mei Cheng, Elaine Zhong; Burke, Williams & Sorensen, Charles E. Slyngstad, Nicholas J. Muscolino; Best, Best & Krieger and

Christi Hogin for Defendants and Respondents City of Los Angeles and the Los Angeles City Council.

Latham & Watkins, James L. Arnone and Benjamin J. Hanelin for Real Parties in Interest and Respondents CH Palladium, LLC, CH Palladium Holdings, LLC and 5929 Sunset (Hollywood), LLC.

DLA Piper, A. Catherine Norian, Kyndra Joy Casper, Andrew Brady and Karen L. Hallock for Real Party in Interest and Respondent CRE-HAR Crossroads SPV, LLC.

Glaser Weil Fink Howard Avchen & Shapiro, Patricia L. Glaser, Joel Klevens and Alexander J. Suarez for Real Party in Interest and Respondent 6400 Sunset, LLC.

---

## INTRODUCTION

This appeal concerns four separate multi-use development projects within a one-mile radius along Sunset Boulevard in Hollywood. After filing unsuccessful petitions for writ of mandate challenging the approval of two of the projects under various land use laws,[1] appellant AIDS Healthcare Foundation (AHF) sued the City of Los Angeles and the Los Angeles City Council (collectively, City) for violating the federal Fair Housing Act (the FHA) and the state Fair Employment and Housing Act (FEHA) based on a disparate-impact theory of liability. AHF now alleges the City's approval of the four "upscale" developments will cause housing prices in the area to rise and disproportionately

---

[1] AHF filed separate petitions for writ of mandate to challenge the projects under CEQA, the Los Angeles City Charter and Municipal Code, and other zoning and land use laws. Final judgments have been entered against AHF on two of its challenges and its other two petitions await trial.

2

displace Black and Latino residents who no longer will be able to afford to live there.

The City and Real Parties in Interest—the projects' owners and developers—separately demurred to AHF's complaint. The trial court sustained the demurrers without leave to amend after finding AHF failed to state a cause of action for violation of the FHA or FEHA, the statute of limitations barred the complaint as to three of the projects, and the doctrine of res judicata and prohibition against basing two lawsuits on a single cause of action precluded the action.

We conclude the trial court correctly found AHF cannot assert a cause of action under the FHA and FEHA based on its alleged disparate-impact theory of liability and affirm the judgment on that basis alone.

## FACTS AND PROCEDURAL BACKGROUND

Consistent with the applicable standard of review, we draw our statement of facts from the allegations in the complaint and matters properly subject to judicial notice.[2] (*Blank v. Kirwan*

---

[2] The trial court properly took judicial notice of several court documents and City records. Our summary includes facts stated in those documents. On appeal, Real Parties in Interest 5929 Sunset (Hollywood), LLC and CRE-HAR Crossroads SPV, LLC filed a joint motion requesting we take judicial notice of court records from the related petitions for writ of mandate AHF and others filed against them. AHF did not oppose the motion. We now grant the joint motion and take judicial notice of the identified documents. (See Evid. Code, § 452, subd. (d) ["Judicial notice may be taken of . . . [r]ecords of [ ] any court of this state."]; § 453 [court "shall" take judicial notice of a matter specified in Evidence Code section 452 on request of a party if the party provides notice to the adverse party and provides the court with "sufficient information to enable it to take judicial notice of the matter"].)

3

(1985) 39 Cal.3d 311, 318; *Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP* (2010) 183 Cal.App.4th 238, 240.) We treat as true " 'all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " (*Blank*, at p. 318.)

**1.    *AHF***

AHF is a nonprofit organization based in Los Angeles that provides medicine and advocacy to over 1,250,00 people in 43 countries.  Many of AHF's clients are at risk of homelessness and are in extremely low to moderate income households.  AHF's "Housing is a Human Right" project advocates for housing policies that reduce homelessness, protect racial minorities, and avoid or reduce gentrification.  AHF also provides affordable housing to lower-income people in the Los Angeles area through its Healthy Housing Foundation.

**2.    *The Real Parties in Interest***

The Real Parties in Interest (real parties) are four unrelated real estate developers that each applied for and secured entitlements from the City to develop four different mixed-use development projects along Sunset Boulevard in an area of Hollywood known as the "Hollywood Center."  The projects are known as:  the Palladium project, the Sunset Gordon project, the Crossroads project, and the 6400 Sunset project (collectively, the Projects).[3]

---

[3]     The Palladium project belongs to real parties CH Palladium, LLC and CH Palladium Holdings, LLC (Palladium); the Sunset Gordon project belongs to real party 5929 Sunset (Hollywood), LLC (Sunset Gordon); the Crossroads project belongs to real party CRE-HAR Crossroads SPV, LLC (Crossroads); and the 6400 Sunset Project belongs to real party 6400 Sunset, LLC (6400 Sunset).

4

a.     *The Palladium Project*

The Palladium project is a 28-story, 927,354 square foot development consisting of an 86-foot high, 800,000 square foot parking "podium" and a pair of "luxury residential towers" with 731 condominium units and 24,000 square feet of restaurant/bar and retail space.  The proposed site is on two surface lots located alongside and behind the Hollywood Palladium music and entertainment building.  The project will restore the Palladium building and also include 33,800 square feet of landscaped public courtyards.  Ninety-five percent of the dwelling units will be sold or rented at market rate and five percent (about 37) of the units will be reserved for " 'households earning between 50 and 120 percent of the area's median income.' "

The City approved the project on March 22, 2016 after holding public hearings.  In April 2016, AHF filed a petition for writ of mandate challenging the Palladium project's approvals.  The trial court entered judgment on the pleadings on some of AHF's claims and separately denied AHF's petition on the remaining causes of action.  On August 29, 2019, the Court of Appeal affirmed the trial court's judgment, and the Supreme Court denied AHF's petition for review on November 13, 2019.

b.     *The Sunset Gordon Project*

The Sunset Gordon project is a 22-story, 324,693 square foot mixed-use development on about 1.65 acres.  It includes a four-story parking podium, a luxury residential tower with 299 apartments, 46,100 square feet of restaurant/bar, retail, and office space, and a 18,962 square foot public park.  Of the 299 apartments, five percent (15 units) are set aside for very low income residents, and five percent (15 units) are set aside for

5

workforce housing.[4]  The remaining apartments are market rate units.

Sunset Gordon purchased the property in 2011 after the original developer and owner went bankrupt.  In 2015, it applied to the City to re-entitle the project.  After holding public hearings, the City approved the Sunset Gordon project on December 12, 2018.

On January 15, 2019, Coalition to Preserve L.A. filed a petition for writ of mandate challenging the Sunset Gordon project.  AHF joined the lawsuit as a petitioner in an amended petition alleging additional causes of action.[5]  On December 13, 2019, the trial court denied the petition as to the original six causes of action brought by Coalition to Preserve L.A.  Trial on the causes of action added by the amended petition is yet to be conducted.

c.    *The Crossroads Project*

The Crossroads Project is a 1,381,000 square foot mixed-use development on about 8.34 acres at the edge of the Crossroads of the World complex.  It consists of a 26-story hotel, an eight-story parking podium, 95,000 square feet of office space, and 190,000 square feet of restaurant/bar, retail, and commercial space.  It includes 18 proposed restaurants, a supermarket, a 30,000 square foot movie theater, a private gym, publicly

---

[4]    Although not alleged in the complaint, according to the City's Notice of Determination for the Sunset Gordon project, of which the court took judicial notice, the project also included 15 moderate income units.

[5]    On October 15, 2019, the trial court granted Coalition to Preserve L.A.'s motion for leave to add AHF as a petitioner and to file the amended petition.  The amended petition was not filed until December 17, 2019, however.

accessible courtyards, and a "pedestrian paseo" for outdoor events.

The project also includes 950 dwelling units: 89 percent (845) are market-rate units and 11 percent (105) are reserved for very low income residents. The project will demolish an apartment building with 84 units of existing rent-stabilized housing. Forty units are to be reserved for former tenants of the demolished apartments who qualify as very low income households.

In November 2016, Governor Brown certified the Crossroads project as an Environmental Leadership Development Project (ELDP) under the Jobs and Economic Improvement Act of 2011, Public Resources Code section 21178 et seq. The City approved the project on January 22, 2019.

On February 19, 2019, AHF and another entity filed a petition for writ of mandate challenging the City's approval of the Crossroads project.[6] The trial court denied the petition. On July 26, 2019, the Court of Appeal dismissed AHF's appeal as untimely. The Supreme Court denied AHF's petition for review on October 16, 2019.

    d.    *The 6400 Sunset Project*

The 6400 Sunset project is a 26-story, 231,836 square foot development with a six-story parking podium, a luxury residential tower with 200 dwelling units, and 7,000 square feet of restaurant/bar and retail space. The development is proposed on a lot "looming over the historic ArcLight Cinerama Dome." Ninety-five percent of the project's dwelling units (190) will be sold or rented at market rates and five percent of the units

---

[6]    Crossroads filed a notice of related case in this action. The trial court granted it and found the earlier petition was the lead case.

(10) will be set aside for very low income residents. The City approved the project on June 25, 2019.

On July 22, 2019, AHF and Coalition to Preserve L.A. filed a petition for writ of mandate challenging the City's approval of the 6400 Sunset project. The trial has not yet taken place.

## 3. *Hollywood Center*

### a. *The Hollywood Community Plan*

In 1988, the City Council of the City of Los Angeles adopted the Hollywood Community Plan "to provide an official guide to the future development of the Community." The Community Plan describes the Hollywood Center as the "focal point of the Community," and states it "shall function . . . as the commercial center for Hollywood and surrounding communities . . . and as an entertainment center for the entire region." The Community Plan provides that "[f]uture development [in the Hollywood Center] should be compatible with existing commercial development, surrounding residential neighborhoods, and the transportation and circulation system." It "especially encourage[s]" "[d]evelopments combining residential and commercial uses" in this area.

The Community Plan was implemented "to promote an arrangement of land use, circulation, and services which will encourage and contribute to the economic, social and physical health, safety, welfare, and convenience of the Community . . .; guide the development, betterment, and change of the Community to meet existing and anticipated needs and conditions; balance growth and stability; reflect economic potentials and limits, land development and other trends; and protect investment to the extent reasonable and feasible." Its objectives include to (1) "coordinate the development of Hollywood with that of other parts of the City," including, "the development of Hollywood as a major center of population,

8

employment, retail services, and entertainment"; (2) "designate lands at appropriate locations for the various private uses and public facilities in the quantities and at densities required to accommodate population and activities"; (3) "make provision for the housing required to satisfy the varying needs and desires of all economic segments of the Community"; (4) "promote economic wellbeing and public convenience through: [¶] (a) allocating and distributing commercial lands for retail, service, and office space in quantities and patterns based on accepted planning principles and standards."

The City found each Project is "consistent with and/or will help to implement one or more of the" Community Plan's objectives and goals. The City also found the Projects "to be consistent with the goals, objectives, and policies of the General Plan Framework," including its objective to "[r]einforce existing and encourage the development of new regional centers that accommodate a broad range of uses that serve, provide job opportunities, and are accessible to the region, are compatible with adjacent land uses, and are developed to enhance urban lifestyles." The Projects are located in an area designated as a "Regional Center."

For example, the City found the Palladium project consistent with the above goals and objectives because it "would enliven the Hollywood Center area by contributing to the Regional Center's identity through the replacement of surface parking with the provision of new housing and commercial uses in a high quality development that reinforces the iconic character of Sunset Boulevard, thereby enhancing the existing concentration of housing and amenities that serve nearby residents, the City, and which caters to tourists."

9

Together, the four Projects will net 2,096 new housing units with 182 of those units reserved for very low, low, and moderate-income households.

b.    *Gentrification/Demographics*[7]

In 2015, the City was awarded a grant to create a team "to study gentrification[8] from a data-driven perspective." According to the City Manager at the time, the City's goal was " 'to take advantage of something that's clearly positive:  neighborhoods seeing more private investment—and [to] ensure the current residents and businesses in those neighborhoods enjoy the benefits.' "  (Emphasis omitted.)  The team created "two tools to evaluate the potential for displacement and neighborhood change":  the " 'Los Angeles Index of Displacement Pressure' " and the " 'Los Angeles Index of Neighborhood Change.' "[9]

According to those indices, which take into account several metrics, the neighborhoods in and around the Projects' sites have had "high levels of change" from 2000 to 2014, reflecting "the fact that gentrification in this area has begun, and will be exacerbated by the Projects."  Based on the City's Index of

---

[7]    The complaint spends several paragraphs describing the factors of gentrification and causes of displacement, and their effects, as stated by various academic studies and analyses. We do not repeat those studies here.

[8]    The complaint defines "gentrification" as " 'a simultaneously spatial and social practice that results in "the transformation of a working-class or vacant area of the central city into middle-class residential or commercial use" – meaning the influx of both capital (real estate investment) and high-income or – educated residents.' "

[9]    Displacement, according to the complaint, occurs " 'when households are forced to move out of their neighborhood.' "

Displacement Pressure, the area surrounding the Projects has a " 'Very High' rate of displacement pressure," making the "residents in the area around the Project[s] at 'risk' of displacement."

In the part of Hollywood where the Projects are located, 32 percent of residents are Hispanic or Latino, 12 percent are Asian, and 6 percent are Black or African American. Twenty-one percent of the Latino population in the area live below the poverty rate. The median household income for Latino residents is $44,492, less than the county-wide median of $57,952, and the per capita income for Latino residents is $17,241 versus $30,798 county-wide.[10] "Over two-thirds of Latino households are classified by the Department of Housing and Urban Development as 'low income' (income at 80% or below of the County median income), and 44% as 'very low income' (at or below 50% of County median)." About "half of all Latino renter households are rent-burdened, spending over 30 percent of their household income on rent." The "significant" disparity "between non-Hispanic whites and Latino per capita income . . . show[s] that Latino residents will more likely be impacted and displaced by the Projects."

"The approvals of the Projects involve at least three of the [four] factors that lead to gentrification and displacement: they add amenities in the form of improved retail and restaurant facilities in a more attractive shopping center; they add productivity by providing office space and additional jobs in the hotel and retail/restaurant facilities; and they provide access throughout the LA area through the nearby Metro stations. . . . Even though the amenities and productivity may benefit the

---

[10] AHF drew its statistics from the U.S. Census Bureau's American Community Survey Public Use Microdata Area for the Projects' location within the 90028 zip code.

11

area, without appropriate mitigation, these features are likely to result in displacement of the current local community." Based on, among other things, the area's " 'Very High' " risk of displacement, "the amenities and productivity that the Project[s] will bring to the area which are shown to cause gentrification-related displacement, and the already rent-burdened status of the Black and Latino population, the Projects are likely to have a disparate impact on Black and Latino residents by increasing the likelihood that these residents will be displaced from the homes in which they currently reside."

### 4.    *The complaint*

AHF filed its complaint against the City and City Council on August 8, 2019, alleging two causes of action:  (1) violation of the FHA, 42 U.S.C. § 3601 et seq., and HUD regulations, 24 C.F.R. § 100.1 et seq. (2020); and (2) violation of FEHA, Gov. Code, § 12955 et seq.  The complaint challenges the City's decisions to permit construction of the Projects "without providing adequate measures to ensure that the Projects would not displace protected minorities, as required by the [FHA] and [FEHA]."  AHF alleges the City approved the Projects "without including measures that will address the displacement of Black and Latino residents, such as requiring sufficient affordable housing be included in the Projects, or by requiring the provision of other permanent affordable housing elsewhere near the Project[s]."

In support of its FHA claim, AHF alleges the "approval of the Projects and the terms of their respective Conditions of Approval constitute policies of the City . . ." which will disparately impact Black and Latino residents through "the gentrification of the surrounding community by the construction of a large number of residential housing units that are unaffordable to the vast majority of current Black and Latino

12

residents of the surrounding neighborhood." AHF alleges the City's determinations about what community benefits should be included in the development agreements for the Projects are "policy determination[s] made by the City in agreeing to the terms of each" project's development agreement, rendering "the approval of the Projects . . . a facially-neutral policy under the FHA."

The complaint asserts the City made findings that the Projects were consistent with previously adopted City policies, including the Hollywood Community Plan, the General Plan Amendment, and the Community Redevelopment Area for the Hollywood Redevelopment Area. AHF alleges those listed policies "cause the disparate impacts identified in th[e] Complaint because [they] encourage development that, like the Projects, has the effect of displacing lower income Black and Latino residents by providing amenities like 'high quality' restaurants, retail, and entertainment options that make the neighborhood more attractive to higher income residents, while only providing housing that is unaffordable to the vast majority of the current Black and Latino residents. The Projects' operation will lead to rising rents and increase the likelihood that current residents will be displaced from their homes in the neighborhoods around the Projects without housing affordable to these residents within the Projects themselves." Because the approval of the Projects "has an unjustified discriminatory effect on members of minority communities" and "perpetuates segregated housing patterns because of race, color, or national origin," the approval of the Projects "violates the FHA as implemented through the HUD Regulations." AHF makes similar allegations in support of its FEHA cause of action.

13

AHF asks the court to void the City's "approvals"[11] of the four projects and enjoin the City and Real Parties from "taking any action to implement the Projects" or to construct them "until such time as the City Council has issued approvals without a discriminatory effect as required by the FHA and FEHA, which approvals include measures that adequate [*sic*] mitigate for the future displacement of Black and Latino residents."

**5.    *The demurrers and judgment***

The City and real parties filed separate demurrers to the complaint. The Crossroads real party also filed a separate motion for an order confirming the case is subject to California Rules of Court, rules 3.2220 et seq. and 8.700 et seq., that govern ELDP litigation (ELDP rules).

The trial court heard oral argument on November 15, 2019. After hearing argument, the court sustained the demurrers without leave to amend and filed its final written ruling that same day. The court found the complaint failed to state a cause of action against the City or the real parties under the FHA and FEHA. The court also concluded AHF's causes of actions as to the Crossroads, Palladium, and Sunset Gordon projects were barred by the statute of limitations, and the case as it relates to all four Projects was barred on res judicata (or related) grounds. Finally, the trial court granted Crossroads' ELDP motion. On

---

[11]    The "approvals" AHF challenges include "(a) an Environmental Impact Report [(EIR)] and various Errata[,] (b) a General Plan Amendment, (c) Zone and Height District Changes, (d) a Conditional Use for Alcohol, (e) a Finding of Convenience and Necessity for an Offsite Alcohol License, and Conditional Use Permits for on-site alcohol consumption, (f) a Zoning Administrator's Interpretation specifying front, rear and side yards, (g) a Site Plan Review, and other associated entitlements."

14

December 13, 2019, the trial court entered judgment in favor of the City and real parties.

AHF appealed within the time prescribed by the ELDP rules.  Palladium, Sunset Gordon, and Crossroads filed a joint respondents' brief and joined in the City's respondent's brief.  The City also joined in part of the joint respondents' brief.  6400 Sunset joined in the City's respondent's brief.

## DISCUSSION

### 1. *Standards of review*

"On appeal from a judgment after a demurrer is sustained without leave to amend, we assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and facts of which judicial notice can be taken." (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1181.)  "[W]e give the complaint a reasonable interpretation, and read it in context." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 (*Schifando*).) "[W]e examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.)  "If the complaint fails to plead, or if the defendant negates, any essential element of a particular cause of action, this court should affirm the sustaining of a demurrer." (*Consumer Cause, Inc. v. Arkopharma, Inc.* (2003) 106 Cal.App.4th 824, 827.)

We also "must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.]  If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred.  [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect.  [Citation.]" (*Schifando*, *supra*, 31 Cal.4th at p. 1081.)

15

## 2. *The complaint fails to state a cause of action for violation of the FHA and FEHA as a matter of law*

### a. *Disparate-impact theory of liability*

The FHA makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." (42 U.S.C. § 3604(a).) "A dwelling can be made otherwise unavailable by, among other things, action that limits the availability of affordable housing." (*Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mt. Holly* (3d Cir. 2011) 658 F.3d 375, 381 *(Mt. Holly)*.) The statute was enacted to "eradicate discriminatory practices within [the housing] sector of our nation's economy." (*Texas Dept. of Housing & Community Affairs v. Inclusive Communities Project, Inc.* (2015) __ U.S. __, __ [135 S.Ct. 2507, 2521] (*Inclusive Communities*).)

AHF alleges a disparate-impact claim under both the FHA and FEHA.[12] A disparate-impact claim challenges "practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." (*Inclusive Communities, supra,* 135 S.Ct. at p. 2513; 24 C.F.R. § 100.500(a) (2020) ["A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color . . . or national origin."].)

---

[12] The Legislature sought to make FEHA substantially equivalent to the FHA and its amendments. (*Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1421, 1420.) "Accordingly, '[c]ourts often look to cases construing the FHA . . . when interpreting FEHA.' " (*Id.* at p. 1420.) We address, as the parties and trial court did, the two claims together and intend our references to the FHA also to cover FEHA.

16

Disparate-impact claims are cognizable under both the FHA and FEHA.  (*Inclusive Communities*, at p. 2525; *Sisemore, supra*, 151 Cal.App.4th at p. 1423.)  Suits challenging "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification. . . . reside at the heartland of disparate-impact liability." (*Inclusive Communities,* at pp. 2521-2522.)

Although the Supreme Court in *Inclusive Communities* recognized disparate-impact liability under the FHA, it cautioned that the "FHA is not an instrument to force housing authorities to reorder their priorities.  Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation." (*Inclusive Communities, supra*, 135 S.Ct. at p. 2522.)  The Court thus held "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.' " (*Id.* at pp. 2522, 2524.)

The Court also explained, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." (*Inclusive Communities, supra,* 135 S.Ct. at p. 2523.)  The Supreme Court directed courts to "examine with care whether a plaintiff has made out a prima facie case of disparate impact . . . .  A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." (*Ibid.*)

The Supreme Court emphasized these "limitations on disparate-impact liability . . . are also necessary to protect

17

potential defendants against abusive disparate-impact claims." (*Inclusive Communities, supra*, 135 S.Ct. at p. 2524.) Finally, the Court noted "[r]emedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that 'arbitrar[ily] . . . operate[s] invidiously to discriminate on the basis of rac[e].' " (*Ibid.*)

With these principles in mind, we consider AHF's alleged theory of disparate-impact liability.

b.    *AHF has not alleged a policy that is an "artificial, arbitrary, and unnecessary barrier[ ]" to fair housing*

AHF initially contends the complaint alleges the existence of a policy or practice, challenging the City's argument that the alleged policy is too vague or constitutes the lack of a policy. As articulated by AHF, "the City's specific implementation of the Hollywood Community Plan and its approval of these four major projects constitutes various policies and decisions." It contends the City approved the Projects after "numerous negotiations [and] determinations," including zoning waivers and the granting of conditional use permits, and imposing certain "conditions," all of which constitute "policy decisions, made to implement the Hollywood Community Plan."

We agree that AHF has sufficiently alleged the existence of a City policy or practice, at this early pleading stage.  For example, in *Mhany Management v. County of Nassau* (2016) 819 F.3d 581, 619 (*Mhany*), the Second Circuit concluded a City's decision to rezone an area for single family dwellings rather than multi-family dwellings—that affected one piece of property—fell "within a classification of a 'general policy,' " where the zoning change involved months of hearings and meetings, consideration of objections, and the passage of a local law. (See also *Avenue 6E Investments, LLC v. City of Yuma* (D.Ariz. Jan. 29, 2018, 2:09-cv-00297 JWS) 2018 U.S. Dist. Lexis 14913 at *19-20 (*Avenue 6E*)

18

[finding a city was "setting policy" in an area by denying a rezoning request to allow for smaller lots; denial "involved hearings and discussions as to how neighboring developments in the area would be affected and also directly resulted in a change to the adjacent property's zoning to ensure future development in that area was reserved for the largest lots"].)

The complaint makes similar express and implied allegations about the City's approval of the Projects to revitalize the area. AHF alleges the approval process for the Projects was "lengthy," and included debate "in public hearings and in written communications" about what "community benefits" should be included as part of the development agreements (presumably between the City and the Projects' developers). AHF also alleges the City approved the Projects, including granting various land use entitlements, to "aid in the implementation" of the City's existing land use policies, including the Hollywood Community Plan, the General Plan Amendment, and the Community Redevelopment Area for the Hollywood Redevelopment Area. Accepting these allegations as true, the City's approval of the Projects made in the context of implementing its land use plans can be classified as a policy.

Whether the complaint alleges a policy that is an " 'artificial, arbitrary, and unnecessary barrier[ ]' " to fair housing is another matter. In essence AHF alleges the City's implementation of its land use policy by approving "these four large, upscale, multiuse projects within a one-mile radius"—without requiring measures to mitigate against the displacement of minority residents—creates a barrier to fair housing because the Projects will lead to gentrification and thereby drive rents up, disparately displacing Latino and Black residents who will be unable to afford the higher rents.

19

The City contends there is no barrier to housing for the court to remove because its approval of the Projects creates housing—both market rate and income-restricted units.[13]  We do not agree that the creation of housing alone is an absolute shield from disparate-impact liability.  After all, in *Mhany*, the city's decision to rezone an area for single-family dwellings—instead of multi-family housing—opened the door for the construction of housing where none had existed due to the area's former public zone designation.  (*Mhany, supra*, 819 F.3d at pp. 589, 597-598.)  But there, the city's shift from zoning for multi-family to single-family housing *decreased* the availability of affordable housing in the area, which disparately impacted minorities.  (*Id.* at pp. 598, 619-620.)

Nevertheless, as the City argues, its alleged discriminatory policy is missing a key feature of the policies examined in the cases relied on by AHF:  the City's approval of the Projects neither prohibits the construction of affordable housing in the area nor physically removes affordable housing to make way for more expensive housing or other uses.

AHF relies on *Mhany, supra*, 819 F.3d 581; *Avenue 6E, supra*, 2018 U.S. Dist. Lexis 14913; and *Mt. Holly, supra*, 658 F.3d 375.  In *Mhany*, the zoning decision *prevented* the building of multi-family dwellings thereby decreasing the availability of housing for minorities where affordable housing already was scarce.  (*Mhany*, at pp. 588, 620.)  The court of appeals thus affirmed the district court's finding that the plaintiffs established a prima facie case of disparate-impact liability under the FHA.

---

[13]     As alleged by AHF, the City's approval of the Projects will result in a net increase of 2,096 residential units, at least 182 of which will be income-restricted.

(*Id.* at p. 620.) In other words, the restriction on the development of multi-family housing created a barrier to fair housing.

Similarly, in *Avenue 6E*, the city's denial of a developer's request to rezone an area to allow for smaller lots prevented the building of affordable or moderately priced homes that allegedly "exclude[d] Hispanic homebuyers from [the] area." (*Avenue 6E, supra*, 2018 U.S. Dist. Lexis 14913 at *3-5, 18, 24 [denying city's motion for summary judgment on plaintiffs' disparate-impact claim under the FHA].) Finally, in *Mt. Holly*, the Third Circuit reversed an order granting summary judgment on residents' disparate-impact claim under the FHA where their township implemented a redevelopment plan that "would eliminate existing homes in [a neighborhood], occupied predominately by low-income residents, and replace them with significantly more expensive housing units." The replacement housing was "well outside the range of affordability for a significant portion of the African-American and Hispanic residents." (*Mt. Holly, supra*, at pp. 377, 379-380 [concluding district court misapplied standard to determine whether residents could establish a prima facie disparate-impact case].)

In other words, in all of these cases the defendant's policy *affirmatively* prevented the building of or removed affordable housing in areas where minority residents were disproportionately affected. The City's approval of the Projects here does not. AHF responds it has alleged a barrier to housing for a protected class because the Projects will (1) demolish existing "rent-controlled housing occupied by a significant number of minorities"; (2) create housing "disproportionately unavailable and unaffordable to a protected group"; and (3) "cause[ ] the disproportionate displacement of a protected group by making surrounding housing unaffordable (thus eliminating previously existing affordable housing)." Assuming

21

the truth of these allegations, AHF has not alleged the City's approval of the Projects—and its decisions and implementation of land use policies that went with it—is *itself* a barrier to fair housing as *Inclusive Communities* requires.[14]

### i. AHF has not alleged the City's policy restricts affordable housing

First, AHF has not alleged the City has restricted the building of affordable housing in the area through zoning, an ordinance, or other land use decision, as part of its approval of the Projects.  AHF does not allege, for example, that the City applied a zoning or other land use law effectively to preclude construction of affordable housing in the area, as in *Mhany's* restriction on multi-family dwellings or *Avenue 6E's* lot-size restrictions.  Moreover, in both *Mhany* and *Avenue 6E*, the cities were faced with development proposals requiring a less restrictive zoning designation to enable the construction of more affordable housing than the ultimate designations allowed.  AHF does not suggest the City's approval of the Projects prevented a competing development from constructing affordable housing.

---

[14]    In discussing causation, AHF argues that, for purposes of establishing a prima facie case, the HUD regulations—left intact by *Inclusive Communities*—require it to allege only that the City's policy "predictably will cause a discriminatory effect on a protected class."  (Citing 24 C.F.R. § 100.500(c)(1).)  While we need not address the parties' causation  arguments, *Inclusive Communities* made clear "[g]overnmental . . . polices are *not* contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.' " (*Inclusive Communities, supra*, 135 S.Ct. at p. 2524, italics added.)  Accordingly, as part of its prima facie case, AHF must plead the City's policy itself is the barrier to fair housing.

Second, AHF has not alleged what *actual* restrictions the City's approval of the Projects places on access to affordable housing. Instead, under AHF's gentrification theory, the City's development policy has disproportionately limited the availability of housing to Latinos by "making surrounding housing unaffordable." AHF theorizes the "upscale" Projects will revitalize the area causing rents to rise as higher-earning residents are attracted to the developments. Latinos will be disproportionately displaced from the area as they no longer will be able to afford their current housing and cannot afford the new market rate housing the Projects will create.

Assuming the Projects will cause a rise in surrounding rents and disproportionately impact Latinos as AHF portends, AHF has not alleged the City's implementation of its land use plan is the barrier to affordable housing. Rather, the anticipated barrier to affordable housing rests in the hands of private third parties. AHF alleges the possibility of private landowners raising rents as property values in the area increase when the Projects are built. Of course, landlords could raise rents—or not—due to other socio-economic forces, too. Nonetheless, the City's land use decisions and policies associated with its approval of the Projects themselves do not impose higher rents, do not physically reduce the number of available affordable housing units, and do not preclude the development of affordable housing units. In the absence of the City placing actual restrictions on housing, we cannot conclude the City's approval of the Projects is actionable under the FHA or FEHA based on the reduction of affordable housing units as a result of private actors' anticipated increase of rents due to the revitalization of the area stemming from new development.

> ### ii. The City's approval of the Projects does not eliminate housing

23

AHF alleges minorities disproportionately will be unable to afford most of the new housing the Projects will construct, but that new housing will not eliminate existing housing. The market rate housing the Projects will build does not replace existing, occupied housing: the Palladium project will be built on an empty parking lot; the Sunset Gordon project will re-open an already built tower that has sat vacant for about three years with empty housing units; the Crossroads project creates new income-restricted units with a net increase in affordable housing; and the 6400 Sunset project will be built on a lot with no current housing units. Accordingly, the new market rate units will not displace current residents who cannot afford them because they do not replace existing affordable units.

As AHF alleges, and the City does not dispute, the Crossroads project will result in the destruction of an existing rent-stabilized apartment building. The 84 rent-stabilized units slated for demolition, however, will be *replaced* with 105 units restricted for very-low income households.[15] Rather than *reduce* available affordable housing, the replacement of the existing building will *increase* the number of affordable housing units on that site. And, 40 of those new units will be reserved for former tenants of the demolished building. In stark contrast to *Mt. Holly*, the City's policy does not remove existing affordable

---

[15] The City notes that units subject to its rent stabilization ordinance are not income restricted. (L.A. Mun. Code, ch. 15, § 151.00 et seq.) The ordinance protects tenants from excessive rent increases, but allows "landlords to re-set rent to market rates in several circumstances, including, when units are voluntarily vacated." (See, e.g., *id*., § 151.06(C)1.(a).) The new construction not only will add 21 affordable units to the area, but the 84 units replaced with income-restricted units arguably will be more affordable than they are now.

housing to make way for less affordable housing; thus it cannot be classified as a barrier to housing under the FHA.[16]

### iii. AHF seeks to impose a new development policy on the City, rather than to eliminate one

Finally, as we have noted, the "FHA is not an instrument to force housing authorities to reorder their priorities." (*Inclusive Communities, supra*, 135 S.Ct. at p. 2522.) Here, the remedy AHF seeks—the halting of the Projects until the City initiates measures to mitigate the effects of gentrification—is precisely the type of remedy *Inclusive Communities* explained the FHA was not intended to impose. AHF would have the court force the City to "reorder" its development priorities by requiring,

---

[16] Moreover, in the February 2019 Crossroads petition for writ of mandate, AHF litigated and lost its contention that the City did not sufficiently mitigate the loss of affordable housing from the demolition of the rent-stabilized building, and that the project failed to provide sufficient affordable housing. In denying the petition, the superior court found AHF's "evidence of affordable housing shortages in the [Hollywood Redevelopment Area] is lacking." The trial court concluded that, "even if Petitioners substantiated a severe affordable housing shortage," the Community Development Law provisions relating to providing affordable housing as part of a redevelopment project "did not compel the City to condition the [Crossroads project's] approvals on the inclusion of more affordable housing." Rather, the statute in question, Health and Safety Code section 33413, requires the City to produce the required number of income-restricted housing units *anywhere* within the Hollywood Redevelopment Area—not the Crossroads project's site itself—within the City's discretion. And, because the redevelopment agency's implementation plan does not expire until May 7, 2027, the City has another seven years to satisfy the requirement.

for example, additional affordable housing to be built within or near the Projects, as opposed to some other area.

Rather, disparate-impact liability under the FHA should "solely 'remov[e] . . . artificial, arbitrary, and unnecessary barriers.' " (*Inclusive Communities, supra*, 135 S.Ct. at p. 2524.) Eliminating the City's alleged "offending" policy—its approval of the Projects—would not make affordable housing more available to minorities, however. As we have discussed, the Projects add affordable housing units to the area's existing supply. Thus, declaring the City's approval of the Projects void will serve only to *reduce* the number of existing income-restricted housing units, rather than provide greater access to affordable housing, as contemplated by the FHA.

No one disputes the existence of gentrification or its potential ill effects. But, in the absence of a policy that actually limits the availability of affordable housing, AHF's remedy is to petition the City or the Legislature to enact laws or policies to counteract the future effects of gentrification. The FHA and FEHA, however, were designed not to *impose* land use policies on public and private actors, but rather to *eliminate* those policies that are barriers to fair housing. AHF has not alleged such a policy exists here.

Because we conclude the City's approval of the Projects is not actionable as a matter of law under the FHA or FEHA on the ground it does not constitute a policy that is an artificial, arbitrary, or unnecessary barrier subject to disparate-impact liability, we need not consider the parties' other arguments or the other grounds on which the trial court sustained the demurrers. Having affirmed the judgment, we also need not consider AHF's contention the trial court erred when it confirmed this action is subject to the ELDP rules.

### 3. *The trial court did not abuse its discretion by denying AHF leave to amend*

When a demurrer is sustained without leave to amend, the plaintiff bears the burden of proving there is a reasonable possibility of amendment. To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) The assertion of an abstract right to amend does not satisfy this burden. (*McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, 161.) Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action. (*McMartin v. Children's Institute International* (1989) 212 Cal.App.3d 1393, 1408.) Allegations must be factual and specific, not vague or conclusory. (*Cooper v. Equity Gen. Insurance Co.* (1990) 219 Cal.App.3d 1252, 1263-1264.)

Here, AHF has set forth vague or conclusory factual allegations to satisfy its burden of showing that there is a reasonable possibility that it can amend the legal effect of its complaint. For example, while it states it can plead more robust statistics regarding the disparate impact of displacement on Latinos, it offers no specific allegations to support the possibility of amendment and no legal authority showing the viability of new or amended causes of action.[17] Indeed, in its reply brief,

---

[17] At oral argument AHF's counsel suggested it could amend its complaint to plead additional facts to support the complaint's conclusory allegation that the City's "approval of the Projects . . . perpetuates segregated housing patterns" in violation of the FHA. Arguably, some Latino residents in the area will be unable to afford the market rate units in the Projects' new "upscale"

27

AHF asks *this court* to "provide guidance" as to what additional evidence may be required under *Inclusive Communities*. Of course, the burden of showing that a reasonable possibility exists that amendment can cure the defects remains with the plaintiff; neither the trial court nor this court will rewrite a complaint. (*Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1153.)

## DISPOSITION

The judgment is affirmed. In the interests of justice, the parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION

EGERTON, J.

We concur:

LAVIN, Acting P. J.          DHANIDINA, J.

---

buildings. But AHF has not said how the unaffordability of the new units *perpetuates* segregation in the area when currently a disproportionate number of the residents are minorities. Put differently, AHF offers no specific facts explaining how making the area *less* segregated and more socioeconomically diverse violates the FHA or FEHA.